Our final case this morning for argument is Groeneweg v. Jeld-Wen. I'm a little torn about rebuttal. I think I'll only need three minutes. I'm sorry. I'm having a hard time hearing you. Say that again. Sorry. As far as rebuttal goes, I guess I'll just do three minutes. All right. Good morning, Your Honors. I'm Lisa Hunt, here representing Plaintiff Mr. Gary Groeneweg. We are here today seeking a ruling from this court reversing the district court's grant of summary judgment in favor of defendant Jeld-Wen. The claims dismissed are the negligence claim under Oregon's common law and statutory claims under Oregon's employer liability law, which I'll be referring to as ELL, and Oregon's Safe Employment Act, the OC. While unloading windows that were loaded by defendant into his trailer after delivering them to a customer, Mr. Groeneweg suffered severe and permanently disabling injuries caused by, as alleged, the loading of a structure in the building. Under that conception of the case, the relevant facts are there's a 2012 transportation agreement between Jeld-Wen, the defendant, and the plaintiff's employer, Crete. In that agreement, the defendant names itself as the manufacturer, and Crete is the shipper. So there's a manufacturer-shipper relationship under that agreement. The purpose, of course, was to secure regular transportation of the defendant's products to its customers, including the customer at issue in the events here, PB Supply. Another relevant fact is this is not a touch load, which I had to look up because I saw it for the first time in defendant's briefing. A touch load is a full loading and unloading by the trucker. This was a tailgating load. It doesn't require loading the product. It only requires help from the trailer to the gate, tailgate. And in those situations, there's no need to hire an assistant. So that's an irrelevant fact, argued by defendant. Also, what's relevant here is Mr. Grenowick's prior experience and knowledge regarding windows and unloading windows from Jeld-Wen. Yes. Can you tackle the district court's findings in this case and explain where you think the district court went awry? Because I'm doing that from memory. I wrote my notes not on that, but I did brief it, the district court. So the district court, under the negligence claim, concluded that this doctrine called the YOWL doctrine precluded Oregon's common law negligence principles, which focuses on foreseeability instead of a duty breach analysis. That's an error because the YOWL doctrine expressly, by our courts, it only applies to a landowner and to a contractor in control of a work site. And it's a premises liability based claim. So in YOWL, it was a premises liability claim, and it involved the defendant landowner, and I'm sorry. Let me try to circle back to the facts of the case again, because it'll be helpful to hear from you from a factual matter where you think the district court went awry, because the district court went through, well, did Jeld-Wen have any control over the unloading process? The district court's answer was no. Once the load arrives in North Carolina, Jeld-Wen didn't have any role in unloading it. Was the risk obvious? Well, here's somebody who's experienced, and he'd been injured before. So the district court made certain findings derived from the evidence that you presented in the record to reach its conclusion. If we were to reverse, what's the basis for that? What's the analysis that would lead us there? The facts that you were just stating come from the application of the YOWL doctrine. And that's an error, because the only way that the YOWL doctrine applies, and the only way it has been implied in our cases, is if the defendant was a landowner or a contractor in charge of a work site on which the plaintiff was injured. So the first error is applying the doctrine. You can't find a special relationship between these two parties under the YOWL doctrine unless the defendant was a landowner. So assuming we disagree with that, does that mean you lose, or do we go further? Were there any of the YOWL factors that you argue there's a genuine dispute of material fact that the district court should not have resolved? Well, first off, the application of the YOWL doctrine really requires that there be some kind of obviousness of the risk. So the fact that is against that is Mr. Grenowig, it's not obvious to Mr. Grenowig how those windows were loaded. He was excluded from the loading process. Geldwin loaded the dropped-off trailer and then had its own precise loading, which included several rows in, two windows balanced on top of a window below. When that was all sealed and bound up with plywood in between each of those windows, there's no way that just stepping up into the building and doing an inspection, which is checking the security, there's no way that that, well, the expert called it a hazard. So I'm going to say that that potential hazard behind approximately 12 rows of windows existed. Mr. Grenowig's job was only, and he's never experienced this before, and the customer also testified that there was no obviousness of this hazard. So the obviousness of this hazard is not present. It's just that there was no control over the loading and control over the specialized task, which the defendant argues the specialized task is just the unloading of the windows. What do you think was the evidence that, do you think there's evidence that shows the defendant did have expertise or control over the unloading? Well, given that the driver is supposed to do a tailgate assist, and he's only worked with windows once that never had this configuration, he did not have any expertise over... Is there any evidence that Geldwin had control over the unloading or expertise over the unloading? No. I mean, they had nothing to do with the unloading in terms of what happened. However, when looking at the entirety of this project, and now I'm getting fuzzy about whether we're going to be talking about the application of the YAL doctrine or we're talking about ELL and the OC, the project itself is shaped by the parties' agreement. And the project itself, it includes the loading and unloading. The whole thing is the project, and Oregon's cases say so. And I just want to point out, because I hear that there's a temptation to apply the YAL doctrine, it's only been applied in six cases, and each one the defendant was a landowner or a general contractor. In charge of the site, and it involves premises liability. And I think that's best explained in George V. Myers, where it says YAL's rule is that the relationship between a possessor of land or contractor and a specialized subcontractor embodies a special status or relationship. And it's only been applied in six cases and all of those. The defendant, you don't apply the YAL rule until the defendant is a landowner or in charge of the premises where the injury occurred. And then, do you want to hear any more on why the YAL doctrine doesn't apply or should I move on to ELL? You can use your time however you wish, but I wanted to save a few minutes. No, I'm happy you asked questions, because I do want to address concerns of the court. So the defendant has argued that the ELL doesn't apply, because it says that the, well, so here's what the district court got right, since that was the question. The district court concluded that there was a common enterprise. Both parties under the contract agreed to participate in the transportation of goods to customers. So the district court correctly concluded that and defendant has disputed that. But for the common enterprise under the law, under Oregon law, for the common enterprise test to apply, two employers participate in a project. The court of appeals, no, I'm sorry, I'm getting ahead of myself, the common enterprise analysis, one way to prove it and the other is the right to control or actual control. And this is where the interpretations of our courts of what that means within the statute. So the statute uses such broad terms, effectively, all persons having charge of or responsible for any work involving a risk or danger to employees must take every precaution, et cetera. So under the common enterprise test, as it's been construed within that statute, there is a right to control. And the statute, a defendant employer has charge of work when the component part of the undertaking for which it is responsible creates a risk. So this applies directly to the defendant here. The component part was the loading and the unloading was the other part where the risk occurred. And it was created under plaintiff's theory by the loading itself. I just want to remind you that you're down to under three minutes. Did you want to save that time? No, I'll keep going. I mean, I'm going to erase my rebuttal. Is that what I'm doing? Okay. Yes. And the right to control and actual control, it's, again, how you frame that issue. And in Spain, the court was looking at prior cases. And it noted that the Supreme Court said, you've been framing the scope of the work that causes that risk. Too narrowly. It's broader. And that was in Woodbury and George where the Court of Appeals made that mistake. So the conclusion was the work involving a risk or danger does not remain limited to the work performed by the plaintiff, but it includes conditions created by, agreed to, or over which the defendant had some participation. So once you broaden that and look to the defendant's actions, ELL liability is incurred. Lastly, with the OC, the defendant argues that plaintiff's arguments were limited to liability as a purported owner, not as an indirect employer, and that there are no facts showing an OC violation related to ownership of the trailer. That's not how ownership is defined. Owner is defined as, among other things, every person having control or custody of any place of employment. And any place of employment under the two definitions there include the trailer. Specifically, every place where there's carried on any activity related either directly or indirectly to an employer's industry, trade, business, or occupation. So the place of employment includes the trailer, and OC liability can attach because the defendant had control and custody of that trailer during loading. Even though the accident occurred during unloading, the custody or control during the loading you think is sufficient to establish OC liability? I think if you look at Miller v. Georgia Pacific, that was cited in my brief, OC is not, there's not as many cases on it, but certainly look to the statute and what the definitions are, because they're very broad and they have to be applied strictly in a remedial statute. I have five seconds. Any questions? Judge Tashima? No, thank you. Good morning. May it please the Court. My name is Richard Seiving. I represent the defendant, Belinda Seiving. I'm the plaintiff's lawyer. I'm the plaintiff's attorney. I'm the plaintiff's lawyer. I'm the plaintiff's attorney. The District Court correctly held that the contractual relationship between my client, Geldwin, and the plaintiff's employer cut off any duty under the common law negligence claim that Geldwin may have otherwise owed to the plaintiff. That's the YAL doctrine. That's Spain. I'll tell you, Counsel, what my struggle is with this case. I wonder whether the District Court really viewed the factual record construing it in Geldwin's favor rather than the other way around, because here we are in summary judgment, right? It has to be viewed in the plaintiff's favor. So I want to focus on that. I don't know what areas my colleagues want to cover, so we'll give you some time for that. But I really want to focus on the factual record and to determine whether the District Court really determined the factual disputed questions as a matter of law rather than letting it go to the jury. So I'll give you an example. The District Court said that Geldwin has no expertise. Really, it's only a manufacturer of windows. It had no control over the unloading process, but the record does show that Geldwin did reach out to exercise some control over the unloading process. It has a checklist for the drivers. It has guidance on, you know, wearing safety glasses, make sure you don't wear tank tops. It did say that the drivers represent Geldwin as well as its own employers, so that indicates some sort of control, right? And it also, on the obviousness of the risk, said that, well, the plaintiff inspected the windows, and so, therefore, the risk is obvious. But by the time he showed up, the windows had all been loaded. He couldn't see the unsecured windows in the back. So how do we address those issues? Judge Nguyen, I think that's a fair inquiry. Let me just kind of give you the overview of how the court reviewed the evidence that was presented. And on April 28, 2018, the plaintiff shows up at my client's window manufacturing facility in Bend, Oregon. He switches on... Can I stop you for a minute? Do you mind sitting down, counsel? Oh, okay. Thank you. At that time, on April 28, he switches a unloaded trailer for a trailer that had been loaded by the folks at Geldwin. He looks at the trailer, opens it, inspects how the windows have been secured in the trailer, and approves those. He then closes the trailer, puts his enforcer lock on it, and seals the trailer and drives... But could he see the unsecured windows in the back? The evidence is there's a pathway down the middle of the... At least on one side. It's a little discrepancy, but there's... But there's a dispute about that, right? Because he testifies that he couldn't see past the front. So if we're going... We can't resolve that factual dispute at summary judgment in the defendant's favor. Well, skipping ahead to how the accident actually occurred and what the plaintiff testified to in his deposition as to how it occurred, the issue is that the stacking of the windows that the folks that now the plaintiff takes issue with, that didn't cause the accident. That was not a cause of the accident. The counsel we just heard was that there was evidence that the loading of the windows somehow caused the accident. There isn't any evidence of that. Their own expert, the plaintiff's own expert, conceded that Jeldwin properly loaded and secured the windows because they made it 2,600 miles from Bend to Charlotte. And also, the plaintiff was the only one in the trailer who actually knows how the accident occurred. So we only have his testimony to look to to determine what happened here. And Mr. Groenweg specifically said he took the security... Took the straps off, the ratchet straps. They were about a foot apart, and there were two of them holding the windows. Are you saying that there's expert testimony that concedes that the way in which the windows were loaded had absolutely nothing to do with the accident? No, I said... No, my argument is there was no... The actual dispute is whether the way they were loaded contributed to the windows falling on the plaintiff. But I think what the district court found, and I think what the evidence discloses, is there is no evidence that how they were loaded led to the accident. Mr. Groenweg testified pretty clearly in his deposition, and again, he's the only one who was there who knows. He said he took the securement strap off the windows. He tilted it against the wall of the trailer. The windows either shifted or he moved, but that caused the windows to fall. It wasn't how they were loaded, it was... My understanding of the expert testimony is that if they had been loaded differently on pallets or other things, that accident could not have happened. So why isn't this a factual dispute, a genuine factual dispute for the jury? Well, because the evidence of how the accident occurred doesn't touch upon how they were loaded. It touched upon how they were unloaded. I guess what I'm focusing on in asking you these questions is that we have to go right to the test as to whether the risk was obvious and inextricably intertwined with his work as a national driver. So as to whether the risk was obvious, the district court made certain findings, which in the district court's view made it obvious. And so one of those findings was, well, he inspected the windows, so therefore the risk was obvious. Well, when the actual record shows that there's a dispute over whether he could see the unsecured windows or not, so that then knocks down the district court's finding with regard to obviousness, right? And the district court said, well, it's also obvious because he was an experienced driver. He had personally been injured previously, but the prior injury was really because he slipped on the snow. So I'm trying to figure out, like, well, given the record that we have, did the district court get it right in analyzing the facts? Or did the district court really take the disputed issues that we're now discussing with you and draw it in the defendant's favor, rather than letting it go to the jury, rather than draw it in the plaintiff's jury? Now, the jury can figure it out. You may still very well win, but then you argue, well, the risk is obvious, relying on some of the factors that the district court did, and they get to argue the opposite. Well, Judge Nguyen, I think that you have to look at what the injury being claimed was. And in this instance, the risk was that a heavy piece of glass, a window, was in there. A window with a frame around it could potentially fall on you if it wasn't held balanced and held against the wall of the trailer. That's the risk. The risk was that a large, very heavy window could potentially fall. And the plaintiff certainly had knowledge and experience with a heavy window falling on him, because that's what occurred in Colorado six months prior to this instance. Incident. The risk that we're talking about here is that during the unloading process, if you're not careful, a window can fall on you. Well, part of the problem there is that that also seems to be the subject of factual dispute, because his testimony is not that a window fell on him, but that he slipped because of snow melt on the floor. There's also the second factor, which is whether Jeldwyn had any expertise or control over the specialized task, which you argue is just the discrete task of unloading. Plaintiff argues that we should look at it more holistically with the loading. Even if we look at only the unloading, though, the record seems to show that Jeldwyn exercised some control over the unloading by requiring drivers to dress a certain way, to wear safety goggles, and even asked the receiving customer to grade the driver's performance and said that the driver is representing Jeldwyn to that receiving customer. So why isn't that, as a matter of law, sufficient control, or why isn't there at least a genuine dispute of material fact as to whether Jeldwyn exercised enough control over the unloading process? I think you have to look at the entire project from the time that the windows were loaded in Bend to when Mr. Groenweg came in, took possession and custody of the trailer, inspected it, and then sealed the trailer. There's a clear demarcation there in responsibility, in oversight, in the ability to control. The document that we're referring to doesn't, it's an internal Jeldwyn document that's contained in the packet of information that a driver picks up. Keep in mind, Mr. Groenweg had no contact with anyone at Jeldwyn when he picked up these windows. He didn't talk to anybody. He says he went into... You're asking us to ignore a document that is in the record. I mean, you're not saying that it doesn't exist. And if we draw all factual inferences in favor of the plaintiff, because it's your motion for summary and judgment, why wouldn't that document create an inference that Jeldwyn exercised some control over the unloading process? That document doesn't refer to, it's, for lack of a better term, it's a customer service document. What it says is if you're going to deliver Jeldwyn windows, you should do, you should make sure you're presentable, you wear proper clothes, you do that kind of thing. But they didn't exercise control, nor could they conceivably exercise any control upon how the windows are unloaded at any particular customer's facility. These windows are manufactured in Bend. They're shipped nationwide. Different customers have different facilities. In Charlotte, I think they said they had three or four people who assisted. Some customers have far more than that, because these windows are big and heavy. Some have one or two representatives who help unload the windows. Some use different dollies. Some use forklifts. Jeldwyn would have no ability to control how that's done in the field when it no longer owns the windows. It doesn't own the trailer. Mr. Groenweg's not at their employee. I guess what's difficult about this argument that you're raising is that how the windows are loaded or whether it's properly loaded affects the risk in unloading as well. Is it correct that on this record, Jeldwyn's policy says that you can't stack windows past the half end point of the trailer, and here it was packed all the way to the back? I think that refers to so that you can go down and inspect. There's supposed to be a pathway through, which I believe the evidence was that distinction was whether or not the pathway was through the middle and the windows were tilted on both sides of the trailer versus whether they were on one side. But that has to do with your ability to do the inspection or not. But here we've got a driver testifying to the fact that he showed up and it was already loaded and he couldn't see the back because of he couldn't see the unsecured windows because of the size of the windows blocking his view in front of that. He could walk through the trailer and look at the windows because there was a pathway. His testimony was there was a pathway, the question was whether there were two sets of windows, one on each side of the pathway or whether they were on one side of the wall only. But he could walk through and inspect the windows and he testified that he looked in, they were secure, and then he closed and sealed up the trailer. I mean, on the plaintiff's argument that the loading necessarily impacts the unloading, I mean, if Geldwin had not loaded the heavy windows on top of the stack, this accident could not have happened, is that correct? If Geldwin had not loaded the heavy windows on top of the stack, this accident could not have happened, is that correct? No, that's not correct. It wasn't because there was one on top of the other. It was because the straps had been removed. The testimony was both windows fell on him because they somehow shifted or he moved them or, more importantly, no one was there to help him hold the windows up against the wall of the trailer. No one from PV Supply was in the trailer at the time because they had already removed some of the windows from the back of the trailer and were in the warehouse when they heard the windows fall and Mr. Gorenweg scream. So, no, I don't believe the record supports that. In fact, Mr. Corbin, the expert for the plaintiff, specifically said he didn't have any problem with how the windows were loaded, how they were secured, because, of course, they made it all the way across the country. Again, two different scopes of work here, the loading process on one hand and the unloading process on the other hand. Judge Toshiba, did you have questions? No. All right. Thank you very much to both sides for your argument. Thank you. The matter is submitted and that concludes our argument calendar this morning. So we'll be in recess until tomorrow morning. Thank you. All rise.
judges: TASHIMA, NGUYEN, SUNG